**Entered on Docket
August 03, 2006**

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**

1

2

3

4

5

UNITED STATES BANKRUPTCY COURT

6

DISTRICT OF NEVADA

7

* * * * * *

8

| | | |
|---|---|---|
| 9 | In re: ) | Case No.: BK-S-05-17766-LBR |
| 10 | ) MICHELLE RENEE SCHWALB, ) | Chapter 13 |
| 11 | ) Debtor. ) | |
| 12 | ) ) | Date:  March 20, 2006 Time:  9:30 a.m. |
| 13 | ) | |

14

**AMENDED OPINION REGARDING CONFIRMATION OF CHAPTER 13 PLAN**

15

_Table of Contents to Opinion_

16  I.    **Introduction** ........................................................ **2**

17  II.   **Relevant Facts** ..................................................... **3**

18  III.  **Pioneer's Property Interests** ....................................... **5**
     A.    _Pawnbrokers and the Pawning of Goods Generally_ ...................... 6
          1.    Short History of Pawnbroking ................................. 6
19          2.    Recent History, and the Advent of "Title Pawns" ............... 7
20          3.    Nevada's Regulation of Pawnbrokers and Title Pawn Transactions
                        ........................................................... 7
21               a.    State ................................................ 8
              b.    City ................................................. 8
22      B.    _Application of Article 9_ ......................................... 9
          1.    Does Article 9 Apply to Traditional Pawnbroking Activities? ..... 9
23          2.    Pioneer's Transactions Are Not Traditional Pawn Transactions ... 10
     C.    _Applicability of Article 9 to Pioneer's Loans_ ........................... 11
24          1.    Attachment Generally ......................................... 12
              a.    Authenticated Agreement ............................. 13
25               b.    Attachment Based on "Constructive Possession" of the
                    Certificates of Title ................................. 17
26          2.    Perfection ................................................... 18
          3.    Enforcement ................................................. 19
              a.    Unenforceable Forfeiture Clause ...................... 19

|  | b. | Violations of Part 6 of Nevada's Article 9 . . . . . . . . . . . . . . . | 21 |
|  | c. | The Irrelevance of Non-Nevada Statutory Law . . . . . . . . . . | 23 |
| D. | Summary | | 24 |

**IV.    Pioneer's Claims in Bankruptcy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
A.    *No Unsecured Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
B.    *Secured Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       1.    Allowed Amount of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       2.    Effect of Pioneer's Violation of Article 9 on Its Allowed Claim . . . . 26
              a.    Statutory Recovery Under NEV. REV. STAT. § 104.9625 . . . . . 27
              b.    Offset Against Allowed Claim . . . . . . . . . . . . . . . . . . . . . . . 29
       3.    Determination of Secured Claim – Valuation of Collateral . . . . . . . 30
              a.    Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
              b.    Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**V.    Effect of Debtor's Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
A.    *Treatment of Secured Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
B.    *Feasibility* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**VI.    Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

## I.    INTRODUCTION

"Then the bird does not belong to any of you?" Spade asked, "but to a General Kemidov?"

"Belong?" the fat man said jovially, "Well, sir, you might say it belonged to the King of Spain, but I don't see how you can honestly grant anybody else clear title to it – except by right of possession." He clucked. "An article of that value that has passed from hand to hand by such means is clearly the property of whoever can get hold of it."[1]

Possession is the central theme in this case. Pioneer Loan & Jewelry, a pawnbroker, possesses two certificates of title that list it as the owner of two motor vehicles. Michelle Schwalb, the debtor, possesses those vehicles. Pioneer claims exclusive ownership, and that Ms. Schwalb has no legal or equitable interest in the vehicles beyond mere possession. Schwalb counters that Pioneer has no interest in the vehicles because she never transferred title or granted any other interest in them to Pioneer.

Pioneer seeks possession of the vehicles, and has asked this court to force Ms. Schwalb to turn them over to it. Ms. Schwalb seeks to keep the vehicles and pay Pioneer nothing under her chapter 13 plan, the confirmation of which is the subject of this opinion.

Both parties' fallback position is that Pioneer's interest is that of a secured creditor, as it is not disputed that Pioneer originally lent money to Ms. Schwalb on the strength of the

---

[1]Dashiell Hammett, *The Maltese Falcon*, *reprinted in* THE NOVELS OF DASHIELL HAMMETT 397 (1965).

vehicles as collateral. But this presents a different problem: the documents under which Pioneer lent Ms. Schwalb money provided for an annual interest rate of approximately 120%. As a result, by the time Ms. Schwalb filed her bankruptcy, Pioneer's claim had grown to more than double the original loan. Pioneer thus believes that Ms. Schwalb has insufficient resources to pay this claim over the life of her chapter 13 plan. Ms. Schwalb responds that Pioneer's secured claim is less than Pioneer alleges. She offered evidence that she can afford plan payments at the current plan value. She also asserts, and Pioneer does not dispute, that Pioneer's failure to file a proof of claim prevents Pioneer from asserting any unsecured claim related to its loans.

All of these issues were tried to the court during a confirmation hearing on March 20, 2006. After hearing the testimony, and reviewing all the evidence and the pleadings, the court finds that Pioneer is a secured creditor, and that Ms. Schwalb can fund a chapter 13 plan given the findings regarding value (after offsets for statutory damages). The court will thus require the debtor to file an amended plan consistent with this opinion, and when it is filed, the court will confirm that plan.

## II.    RELEVANT FACTS

Michelle Schwalb is not a typical chapter 13 debtor. She holds no job, because she can't hold one. Seven years ago she had a brain tumor removed, leaving her unsteady and unable to concentrate for extended periods of time. Social Security disability payments are her only regular income. She is 34 years old, diabetic, has a non-working pituitary gland, and has initial symptoms of Grave's disease. She must take steroids to live. Ms. Schwalb lives with a man who fathered her only child, and they have been together as a family for thirteen or fourteen years. He works outside the home, and pays most of the household expenses.

Ms. Schwalb's chapter 13 plan is being funded entirely from her monthly disability payments, which are currently $580, and from contributions by her father. Her father's current monthly contribution is $640. Ms. Schwalb's father testified at confirmation that he is doing so out of a desire to take care of his daughter and his grandchild. He also testified that, before his daughter filed this chapter 13 case, he regularly contributed between $600 and $800 per month towards her support.

Ms. Schwalb's father gave her the two vehicles at issue, a 1997 Infiniti QX4 Sport Utility Vehicle and a 2002 Cadillac Escalade. Before dealing with Pioneer, Ms. Schwalb had clean title to both vehicles. Then, sometime during 2004, the debtor, her father and her partner decided they needed to contribute funds to a business that Ms. Schwalb's partner ran. They went to Pioneer and obtained two loans totaling $20,000.

The business, however, failed. Ms. Schwalb had no way to repay Pioneer. At this point, Pioneer began to take action to obtain the vehicles. To understand the actions Pioneer took, however, it is necessary to review the transactions by which Ms. Schwalb obtained the $20,000.

Ms. Schwalb and her father initially approached Pioneer in June of 2004. Mr. Schwalb had done business with Pioneer and, at that time, enjoyed some goodwill with it. Ms. Schwalb's Infiniti QX4 Sport Utility Vehicle was offered as collateral, and Pioneer advanced $4,000 against possession of the certificate of title for the vehicle. The parties testified that

Ms. Schwalb gave Pioneer her certificate of title after she signed it as seller. The buyer's name was left blank.

When she received the $4,000 in loan proceeds, Ms. Schwalb signed a document referred to by the parties as a pawn ticket. The pawn ticket is a preprinted form used by Pioneer in its pawnbroker business. It is a simple 5-inch-by-8-inch form, with text front and back. Among other things, the front has blanks for describing the property pawned, for the amount of the loan and for the repayment date.

On Ms. Schwalb's pawn ticket, the parties designated the property pawned as an Infiniti QX4 Sport Utility Vehicle, and included its Vehicle Identification Number (VIN). The ticket also contained the loan terms. Ms. Schwalb was to repay the $4,000 in 120 days, plus $1,605 interest. The disclosed annual interest rate was 122.04%.[2] If Ms. Schwalb did not "redeem" the pawn and pay the loan within the 120 days, the pawn ticket indicated that "you shall . . . forfeit all right and interest in the pawned property to the pawnbroker who shall hereby acquire an absolute title to the same." Just before the blank on the pawn ticket in which the parties inserted the description of the Infiniti and its VIN, the pawn ticket indicated, in very small five-point type,[3] "You are giving a security interest in the following property: _____". Pioneer did not retain possession of the vehicle. Ms. Schwalb drove off in it with her $4,000. Pioneer put the signed certificate of title in a safe on its premises.

The transaction with the Cadillac was essentially the same, except Pioneer advanced $16,000 against possession of the signed certificate of title, and the interest rate was 121.76%.[4] This transaction occurred on August 19, 2004. In each case, Pioneer's representative testified that the amount Pioneer lent against the certificates of title was within Pioneer's general practice of lending no more than 30% to 40% of the retail value of the vehicle offered as collateral.

Approximately $1,605 in interest on the Infiniti loan was paid on or around November 6, 2004, thus extending the redemption period to March 6, 2005. No interest was ever paid on the Cadillac loan. The final 120-day term expired on the Infiniti loan on March 6, 2005, and on December 17, 2004, for the Cadillac loan.

When Ms. Schwalb did not repay either loan, Pioneer took both certificates of title to the Nevada Department of Motor Vehicles ("DMV") where, sometime in April 2005, Pioneer

---

[2]Interest was payable at 10% per month, or 120% per year, but Pioneer added a $5 charge at the initiation of the transaction, which increased the effective interest rate for the first year of the loan to 122.04%.

[3]In printing, a "point" is 1/72 of an inch. At five points, the statement was thus 5/72, or approximately .07 of an inch, tall. For comparison, most computer word processors tend to default to 12 points, or .167 of an inch, which is almost two and one-half times the size of the print Pioneer used. <sub>This is an example of a sentence in five-point type.</sub>

[4]Interest was payable at 10% per month, or 120% per year, but Pioneer added a $5 charge at the initiation of the transaction, which increased the effective annual interest rate for the first year of the loan to 121.76%.

requested that the DMV reissue the certificates showing Ms. Schwalb as the owner and Pioneer as the "lienholder." The DMV complied. After Pioneer's initial efforts to obtain the vehicles were unsuccessful, Pioneer then presented the newly reissued certificates of title to the DMV, this time requesting that the DMV reissue the certificates of title without any mention of Ms Schwalb, and listing Pioneer as the sole owner. Again the DMV complied. Pioneer then filed a state court lawsuit apparently alleging conversion and seeking recovery of both vehicles. There was testimony that Pioneer consulted with the local police regarding the necessity of changing the certificates of title to facilitate its legal action seeking recovery of the vehicles.

Ms. Schwalb filed her chapter 13 case on August 9, 2005. Pioneer elected not to file a proof of claim, instead opting to claim ownership of the vehicles. Pioneer attempted to obtain relief from stay so that it could obtain the vehicles, but withdrew that motion for procedural reasons.

Ms. Schwalb's plan, filed with her chapter 13 petition, proposes to pay her creditors over 36 months. Her monthly payment is $555 for the first 12 months of her plan, and $709 per month for the remaining 24 months of her plan.

Initially, Ms. Schwalb contends that Pioneer is not a secured creditor, and is barred from participating in her case as an unsecured creditor. Her initial proposal is thus to pay Pioneer nothing under her plan. If Pioneer is found to be a secured creditor despite her objection, she proposes to value the collateral for the secured claims at $16,000 for the Cadillac loan and $4,000 for the Infiniti loan. The plan would then pay these two secured claims full over the life of the plan, together with 10% simple interest.

## III. PIONEER'S PROPERTY INTERESTS

The parties have focused on the nature of Pioneer's property interest, if any, in the two vehicles. Relying on its pawn ticket and the laws of other states, Pioneer contends that it owns both vehicles, and that Ms. Schwalb has no legal or equitable interest in them. Ms. Schwalb counters that Pioneer is not a pawnbroker with respect to the vehicles since it did not retain possession of them after making the loans. Ms Schwalb further argues that the language of the pawn ticket is insufficient to create an Article 9 security interest under Nevada's version of the Uniform Commercial Code (UCC).[5]

Pioneer, if forced to yield on its ownership claims, contends that the language in the pawn ticket is sufficient under Nevada's version of Article 9 to create a security interest, and that it has not violated any of Article 9's requirements or restrictions. Ms. Schwalb, however,

---

[5]There is no material difference between the provisions of Nevada's version of Article 9 and the version of Article 9 promulgated for state adoption by the American Law Institute and the National Conference of Commissioners on Uniform State Laws – at least with respect to the substantive sections analyzed herein. *See* Netbank, FSB v. Kipperman (*In re* Commercial Money Center, Inc.), BAP No. SC-05-1238-MoTB, at 12-13 (B.A.P. 9th Cir., August 2, 2006) ("There are no material differences between the Nevada version and the uniform versions [of the UCC]. . . ."). This opinion thus cites interchangeably between the national designation of the Uniform Commercial Code (*e.g.*, "Section 9-625(c)") and its Nevada codification (*e.g.*, "NEV. REV. STAT. § 104.9625.3").

contends that Pioneer did not comply with significant and mandatory provisions of Article 9, and requests that this court reduce Pioneer's claim.

     A.     *Pawnbrokers and the Pawning of Goods Generally*

> All around the cobbler's bench
> The monkey chased the weasel
> The monkey thought that all was fun
> Pop! Goes the weasel!
>
> A penny for a spool of thread
> A penny for a needle
> That's the way the money goes
> Pop! Goes the weasel![6]

Under Nevada law, a pawnbroker is a "person engaged, in whole or in part, in the business of loaning money on the security of pledges, deposits or other secured transactions in personal property." NEV. REV. STAT. § 646.010. The parties agree that Pioneer is a licensed pawnbroker under this law. They disagree, however, on the significance of Pioneer's status, and to resolve those differences the court must investigate the history and current status of pawnbrokers, and the impact of pawnbroker status with respect to a nonpossessory vehicle loan.

### 1.    Short History of Pawnbroking

Pawnbrokers engage in transactions in which a debtor pawns[7] goods in return for a short-term loan. Pawnbroking has a significant and positive place in the history of lending. *Italian Banks and Pawnbroking: In Hock*, THE ECONOMIST, May 27, 2006, at 73 (reporting that pawnbroking is a 500-year old business and stating that the bank claiming to be the world's oldest bank, the Monte dei Paschi di Siena, began in the pawn business). According to some accounts, Queen Isabella of Spain pawned her jewels to finance Columbus' trip of discovery. Jarret C. Oeltjen, *Florida Pawnbroking: An Industry in Transition*, 23 FLA. ST. U. L. REV. 995, 996

---

[6]Nursery rhyme it may be, but its origins are in pawnbroking. In English slang (and the English version of the rhyme is printed above), to "pop" something is to pawn it; and a "weasel" was slang for a hatter's tool. WILLIAM MORRIS & MARY MORRIS, MORRIS DICTIONARY OF WORD AND PHRASE ORIGINS 457-58 (1977); BREWER'S DICTIONARY OF PHRASE AND FABLE 929 (16th ed., Adrian Room, rev. 1999).

[7]The word "pawn" in this sense comes from Old French *pan* meaning skirt of a gown, which in turn is from Latin *pannum*, meaning cloth or something made out of cloth. JOSEPH P. SHIPLEY, DICTIONARY OF WORD ORIGINS 263 (1945); *see also* THE OXFORD DICTIONARY OF ENGLISH ETYMOLOGY 659 (C.T. Onions, ed., 1966). Until recently, most items pawned were clothing items. JOHN P. CASKEY, FRINGE-BANKING, CHECK-CASHING OUTLETS, PAWNSHOPS AND THE POOR 17 (1994).

(1996).[8] At various times in our history, pawning one's clothes and other possessions was an ordinary and common occurrence.[9]

Pawning one's goods differs from lending against them; in a typical pawn, a debtor deposits goods with the pawnbroker, and receives money in return. If the customer does not "redeem" his pawn within a specified time, tradition has it that the power to sell the goods deposited automatically passes to the pawnbroker. If the pawnbroker's subsequent sale of the goods does not cover the loan, the pawnbroker takes the loss; conversely, if the pawnbroker sells the goods for more than the money lent, custom allows the pawnbroker to keep the surplus. CASKEY, *supra* note 7, at 1. Another way to characterize the transaction is as a nonrecourse loan by the pawnbroker to the customer, with agreed strict foreclosure on the redemption date.

### 2.    Recent History, and the Advent of "Title Pawns"

Despite its venerable history, pawnbroking has lately experienced something of a public relations crisis. Pawnbrokers are regulated in a manner designed to deter personal property theft, and often are found in low-income neighborhoods on the fringe of respectability. Despite efforts to improve this image, "the negative portrait lingers; pawnshops continue to be cast as 'nuisance businesses,' in the company of tattoo shops and massage parlors, and somewhere in rank between liquor stores and houses of prostitution." Oeltjen, *supra*, at 1001.

This negative perception has not been helped by the type of loans present here. As noted in a recent report sponsored in part by the Consumer Federation of America, "car title loans are marketed as small emergency loans, but in reality these loans trap borrowers in a cycle of debt. Car title loans put at high risk an asset that is essential to the well-being of working families – their vehicle." AMANDA QUESTER & JEAN ANN FOX, CAR TITLE LENDING: DRIVING BORROWERS TO FINANCIAL RUIN 2 (2005). As noted by Quester and Fox, some states have passed laws favorable to the title loan industry, *id*. at 10, while others have specifically prohibited pawnbrokers from engaging in "title pawn" transactions, *id* at 11 & n.101. *See id.* at App. A, pp. 32-34 (collecting state statutes permitting and regulating title loans).

### 3.    Nevada's Regulation of Pawnbrokers and Title Pawn Transactions

Nevada has not directly enacted legislation regarding the relationship between traditional pawnbroking and title lending. As a consequence, Pioneer attempts to support its position with extrapolations of existing state and local regulations, as well as of recent Nevada Attorney General opinions. As will be seen, however, these arguments are unavailing.

---

[8]This story is apparently apocryphal. CASKEY, *supra* note 7, at 15.

[9]*See* CASKEY, *supra* note 7, at 17 (noting that, around 1828, more than half of the items pawned in New York City were clothing items).

#### a.    State

Nevada regulates pawnbrokers through a series of provisions found in Chapter 646 of the Nevada Revised Statutes. NEV. REV. STAT. §§ 646.002 to 646.060. Most of these provisions regulate the business and accounting side of pawnbroking; for example, pawnbrokers are required to keep detailed records of their transactions, *id*, § 646.020, and are required each day to turn over records of the previous day's transactions to law enforcement officials. *Id*. § 646.030.

Of all the sections in Chapter 646, only one – Section 646.050 – provides substantive restrictions on the terms of a loan made by pawnbrokers. It requires that pawnbrokers cannot charge more than 10% per month on their loans, and must offer a redemption period of at least 120 days to their customers. *Id*. § 646.050.1. The criminal provisions of the chapter, however, do not refer to this rate regulation; rather, they are concerned with compliance with the recordkeeping provisions. *Id*. § 646.060. This limitation underscores the basic fact that the main purpose of Chapter 646 is not consumer protection, but law enforcement.

Chapter 646 also covers "motor vehicles received in pledge," and permits the storage of such vehicles at a location apart from the pawnbroker's principal place of business. In the late 1990s, when title pawns began to expand in Nevada, the state attorney general was asked to opine on the appropriate classification of such activity. In two opinions cited by counsel, the attorney general found that nonpossessory lending against the strength of a vehicle's title fit within the definition of "pawnbroker" for regulatory purposes because, although it was not the typical possessory lending historically associated with pawnbrokers, it did fit the statutory definition of someone in the business of "loaning money on the security of pledges, deposits or *other secured transactions in personal property*." NEV. REV. STAT. § 646.010 (emphasis supplied). *See* OP. NEV. ATT'Y GEN. 97-03 (1997); OP. NEV. ATT'Y GEN. 95-20 (1995). *See also* OP. NEV. ATT'Y GEN. 97-13 (1997) (clarifying that opinions were meant to aid in the proper regulations of such lending). The attorney general apparently assumed that such nonpossessory lending was subject to Article 9 of Nevada's version of the UCC, *see, e.g.*, OP. NEV. ATT'Y GEN. 95-20 ("Since pawn transactions authorized by NRS Chapter 646 allow the pawnbroker to engage in 'other secured transactions in personal property. . . .'"), but opined that when practiced with the traditional pledge of personal property, it was within the business of pawnbroking, at least for purposes of exempting pawnbrokers from regulation under the installment lending provisions of Chapter 675 of the Nevada Revised Statutes. *Id*.

#### b.    City

Nevada pawnbrokers are also regulated by municipal governments, and Pioneer was (and is) subject to regulation by the City of Las Vegas. Chapter 6.60 of the Las Vegas Municipal Code in most parts copies and expands on Chapter 646 of the Nevada Revised Statutes. It also requires a pawnbroker to be licensed, and requires a separate license if the person "accepts a motor vehicle as pledged property or in any other matter allows the use of a motor vehicle as collateral or security for a loan." LAS VEGAS MUNICIPAL CODE, §§ 6.6.020 (definition of "auto-pawnbroker"); 6.60.035 (requirement of a separate license for auto-pawnbroker).

The municipal provisions applicable to Pioneer are also primarily related to law enforcement, and not to consumer protection. The municipal code, however, does contain certain disclosure requirements for borrowers, and also makes it unlawful for the pawnbroker to charge or receive more than 10% interest per month.

#### B.    *Application of Article 9*

Neither the state nor the local regulation specifically refers to the applicability of the primary statute related to personal property collateral – Article 9 of the UCC.[10]  Conversely, Nevada has not explicitly excluded pawnbroking from the scope of Article 9.  The initial question is thus easily stated: Does Article 9 apply to Pioneer's two transactions with Ms. Schwalb?

#### 1.    Does Article 9 Apply to Traditional Pawnbroking Activities?

Pioneer contends (and often assumes without argument) that pawnbroking is excluded from Article 9.  That contention is false as a matter of statutory construction.  Article 9 is intended to be the primary statute regarding the consensual personal property security.  It is a marvel of drafting that consolidates and resolves many issues into one single statute.  And it is intentionally broad; as noted in the comments, "all consensual security interests in personal property and fixtures are covered by this Article . . . .  When a security interest is created, this Article applies regardless of the form of the transaction or the name that parties have given to it."  Cmt. 2 to UCC § 9-109.

To achieve this breadth of coverage, Article 9 looks to substance over form.  This is confirmed by its text:  Article 9 states that it applies to any "transaction, *regardless of its form*, that creates a security interest in personal property or fixtures by contract."  NEV. REV. STAT. § 104.9109.1(a) (emphasis supplied).

Given this broad scope, some states have altered the breadth of Article 9 by either expanding the list of exclusions to Section 9-109 as adopted, or by restricting the effect Article 9 gives to security interests in Section 9-201.  *Compare* NEV. REV. STAT. § 104.9109.4(n) (excluding "[a] transfer by a government or governmental unit" from scope of Nevada's Article 9) *and* NEV. REV. STAT. § 104.9201.2 (excluding consumer transactions under Chapters 97 and 97A from Article 9's section validating security agreements) *with* UCC § 9-109(d) (containing no exclusion for governmental transfers) *and* UCC § 9-201(b) (containing generic exclusion for consumer protection laws from Article 9's section validating security agreements generally).  *See also* UCC § 9-109(c)(2) (permitting exception for categories of transactions expressly provided by another state statute).

---

[10]As the collateral and the parties are in Nevada, Nevada law (including Nevada's version of the UCC) applies.  NEV. REV. STAT. § 104.9301.  In examining Pioneer's conduct, the court, however, will also refer to generic sections of the UCC, to the national comments to that statute, and to decisions construing the UCC from other states.  This accords with the directions of Nevada's legislature, which has directed that "[t]he Uniform Commercial Code must be liberally construed and applied to promote its underlying purposes and policies, which [among other things,] are: . . . [t]o make uniform the law among the various jurisdictions."  NEV. REV. STAT. § 104.1103.1(c).  This directive also anticipates that courts will refer to the law and to the judicial decisions of other states construing the common text of Article 9.  *See* Yamaha Motor Corp., U.S.A. v. Tri-City Motors and Sports, Inc., 429 N.W.2d 871, 876 (Mich. App. 1988) ("When uniform laws such as the UCC have been adopted by several states, the courts of one state may refer to decisions from another state and may construe the statutes in accordance with the construction given by that state.").

9

In the area of pawnbroking, however, Nevada has not adopted other states' practice of excluding some or all of pawnbroking's practices from Article 9. *See, e.g.,* Cal. Comm. Code § 9201(b) (2006) (exempting California's Pawnbroker Law, Cal. Fin. Code §§ 21000 *et. seq.* from Article 9); 810 Ill. Comp. Stat § 5/9-201(b)(5) (2006) (exempting Illinois' Pawnbroker Regulation Act); N.C. Gen. Stat. 25-9-201(b) (2006) (exempting North Carolina's Pawnbrokers Modernization Act of 1989 (Chapter 91A of North Carolina's General Statutes)).

Given this lack of express exclusion, the court believes that Nevada would join the other states and commentators who have examined the issue, and concluded that pawnbroking is an activity governed by Article 9 of the UCC that neither the parties' contrary language nor an industry's contrary practice can alter. *In re* Davis, 269 B.R. 914 (Bankr. M.D. Ala. 2001) (applying Alabama law); *In re* Jones, 206 B.R. 569 (Bankr. M.D. Ala. 1997) (applying Alabama law); Mattheiss v. Title Loan Express (*In re* Mattheiss), 214 B.R. 20, 28 (Bankr. N.D. Ala. 1997) (applying Alabama law); *In re* Lopez, 163 B.R. 189, 191 (Bankr. D. Colo. 1994) (despite language of forfeiture in pawn agreement, pawn relationship created a secured transaction capable of being modified in a chapter 13 plan); Lynn v. Financial Solutions Corp. (*In re* Lynn), 173 B.R. 894, 900-01 (Bankr. M.D. Tenn. 1994) (applying Tennessee law); Harkness v. EZ Pawn Alabama, Inc., 724 So. 2d 32 (Ala. Civ. App. 1998) (on referral from Alabama Supreme Court); Reeves v. Foutz &Tanner, Inc., 94 N.M. 760, 617 P.2d 149 (1980) (applying Article 9's provisions regarding a surplus following disposition applied to pawn transactions); 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-1(b), at 4 (5th ed. 2002) ("When a pawnshop takes possession of a debtor's clarinet, the parties are entering into a perfected secured transaction."); 8A Lawrence's Anderson on the Uniform Commercial Code § 9-102:152 (3d ed. Lary Lawrence, ed. 2005) ("Pawn transactions are Article 9 secured transactions.") [hereinafter "Anderson"].

### 2.    Pioneer's Transactions Are Not Traditional Pawn Transactions

Even if the court held that pawnbroking's practices are impliedly exempt from Article 9, Pioneer would not prevail for the simple reason that the transactions at issue are not those of a traditional pawnbroker. Pawnbrokers are bailees of personal property held as collateral for loans. If the loan is not paid – or, in the argot of pawnbroking, if the pawn is not redeemed – then the pawnbroker sells the goods held, and keeps the proceeds; the debtor is not liable for any deficiency, and the pawnbroker is not accountable for any surplus. *See* Oeltjen, *supra*, at 996-97.

As a result, a true pawn requires a pledge, and a pledge requires delivery of the collateral to the pawnbroker. *See, e.g.,* Pendleton v. American Title Brokers, Inc., 754 F. Supp. 860, 864 (S.D. Ala. 1991); Lynn v. Financial Solutions Corp. (*In re* Lynn), 173 B.R. 894, 898 (Bankr. M.D. Tenn. 1994); State *ex rel* McGraw v. Pawn Am., 205 W. Va. 431, 433-34, 518 S.E.2d 859, 861-62 (1998). *Cf.* 18 U.S.C. § 921(a)(12) (defining pawnbroker, for purpose of regulating sale of firearms, as "any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money."); Neb. Op. Atty. Gen. No. 98027, 1998 Westlaw 344508, at 1 (June 19, 1998) ("[W]e believe that a pawnbroker is required to have actual possession of the automobile in order for the lending arrangement to constitute a pawnbroking transaction under Nebraska law.").

Here, of course, Pioneer did not possess the vehicles (although state law permitted it to do so); at best, it was a bailee of the certificates of title, for whatever good holding on to

pieces of officially issued paper did it.  As such, the issue as to the exempt status of traditional pawnbroking activities is not directly raised by this case.

Pioneer argues that actual possession was not necessary.  Since it had possession of the certificates of title, it has "constructive" possession of the vehicles, and that this constructive possession was sufficient to bring it under the protective reach of pawnbroking status. Nothing in the Nevada statutory scheme authorizes this view, and pre-UCC cases rejected it.  *See, e.g.*, Casey v. Cavaroc, 96 U.S. 467, 477 (1877); (noting that "possession may be considered as of the very essence of a pledge," and that "constructive delivery cannot be effected without doing what amounts to a transfer of the property," using keys to a warehouse and bills of lading as examples); Commercial Bank of Jacksonville v. Flowers, 116 Ga. 219, 42 S.E. 474 (1902) (constructive possession of goods not accomplished by possession of receipt from wharfinger who had actual possession of goods).  *See also* Section III.C.1.b, *infra*.[11]

## C.    Applicability of Article 9 to Pioneer's Loans

As indicated above, Section 9-109 makes Pioneer's transactions with Ms. Schwalb subject to Nevada's version of Article 9.  This was not unexpected.  Pioneer's form of pawnbroking ticket expressly states that Ms. Schwalb was "giving a security interest" in the two vehicles to Pioneer.  Although more will be said about this language below, it is a clear indication that Pioneer was both aware of the term "security interest," and wanted to use it in the two transactions.  And if a "security interest" is involved, the default statute of applicability is Article 9 of the UCC.

Beyond that, however, as the courts and commentators cited above have found, each transaction here fits within the text of Section 9-109 – that it be a "transaction . . . that creates a security interest in personal property or fixtures by contract."  Nev. Rev. Stat. § 104.9109.1(a).  This can be seen from an analysis of the components of Section 9-109.

The component most obviously present is a contract – a provision that requires that transaction to be consensual.  "Contract," as defined in the UCC is "the total legal obligation that results from the parties' agreement . . ."  Nev. Rev. Stat. § 104.1201.2(*l*).[12]  The UCC defines the term "agreement" as "the bargain of the parties in fact, as found in their language or inferred from other circumstances . . . ."  *Id*. § 104.1201.2(c).

Here, Ms. Schwalb and Pioneer had an "agreement" – Pioneer would lend money to her on the security of her two vehicles.  That was their bargain in fact.  This agreement gave rise to legal obligations – that is, rights that courts would vindicate – some supplied by Nevada's common law of contracts, and others by Nevada's version of Article 9.  This consensual agreement combined with the attendant legal consequences form the necessary

---

[11]As wryly noted by a leading commentator, "[O]ur parents wouldn't recognize the pawnbroker in its modern incarnations." Keith Lundin, Chapter 13 Bankruptcy § 117.1 (3d ed. 2000 & Supp. 2004).  As will be seen, even if there is an exemption for traditional pawnbroker activity, nothing Pioneer did would bring it within that exemption.

[12]Article 9 expressly provides that the definitions from Article 1 apply when interpreting Article 9's provisions. Nev. Rev. Stat. § 104.9102.3.

contract; or, put another way, the transaction was consensual, and breach of it implied various legal consequences.

Was it a contract to create or provide for a security interest? "Security interest" is defined in Article 1 as "an interest in personal property . . . which secures payment or performance of an obligation." NEV. REV. STAT. § 104.1201.2(ii).[13] Here, Ms. Schwalb gave Pioneer an interest in her vehicles as a condition of obtaining the two loans, and Pioneer held onto the title to ensure repayment. When Ms. Schwalb did not repay the loans within the 120-day redemption period, Pioneer's position is that exclusive ownership of the vehicles passed to it. This type of arrangement – in which rights to possession of personal property arise upon failure to repay debt or honor some other obligation – is a classic security interest and fits the definition of "an interest in personal property [that] secure[d] payment . . . of an obligation." NEV. REV. STAT. § 104.9201.2(ii).

As a result, the transactions here were covered by Article 9 of the UCC.[14] This conclusion has serious repercussions for the parties.

**1.    Attachment Generally**

The initial consequence of Article 9's applicability is that the creation and status of Pioneer's interest is governed by a combination of the common law of contract law and the statutory provisions of Article 9. For an Article 9 security interest to be enforceable, it must "attach." NEV. REV. STAT. § 104.9203.

Attachment, in turn, has three requirements: (1) value has to have been given; (2) the debtor must have rights in the collateral; and (3) either (a) the debtor has authenticated a security agreement that provides a description of the collateral, or (b) the secured party possesses the collateral pursuant to a security agreement. NEV. REV. STAT. § 104.9203.2(a)-(c).

Value is present in the form of the loans extended by Pioneer to Ms. Schwalb. NEV. REV. STAT. § 104.1204. Similarly, there is no doubt that, at the time of each transaction, Ms. Schwalb's ownership rights in the vehicles were sufficient "rights in the collateral" for a security interest to attach. Foothill Capital Corp. v. Clare's Food Market, Inc. (*In re* Coupon Clearing Service, Inc.), 113 F.3d 1091, 1103 (9th Cir. 1997) ("Where a debtor has rights to collateral beyond naked possession, a security interest may attach to such rights."), *citing* Morton Booth Co. v. Tiara Furniture, Inc., 564 P.2d 210, 214 (Okla.1977).

The issue thus boils down to whether the "debtor authenticated a security agreement that provides a description of the collateral," or whether the collateral was "in the possession

---

[13]A similar definition is used in Nevada's chapter on motor vehicles. *See* NEV. REV. STAT. § 482.109 ("'Security interest' means an interest in a vehicle . . . reserved or created by agreement, which secures payment or performance of an obligation.")

[14]The court does not reach the issue of whether a true "pawn" – that is, a delivery of possession of personal property to the pawnbroker – is covered by Article 9, although some courts have so held. *See* Section III.B.1 *supra*. *But see* 11 U.S.C. § 541(a)(8) (applicable to cases filed after October 17, 2005) (property subject to traditional pawn may not be property of a bankruptcy estate).

of the secured party under NRS 104.9313 pursuant to the debtor's security agreement." *Id.*
§ 104.9203.2(c)(1)-(2).

### a.    *Authenticated Agreement*

Ms. Schwalb contends that the pawn ticket is legally insufficient as a security agreement. At trial, she testified that she did not know what she was signing[15] at the time she received each of the two loans. Each pawn ticket used, however, contained the following preprinted language just before a description of the automobile involved as well as its VIN: "You are giving a security interest in the following property: _____ "

Under Article 9, a "security agreement" is "an agreement that creates or provides for a security interest." Nev. Rev. Stat. § 104.9102.1(ttt). The pawn ticket was clearly an "agreement" as the UCC uses that term. It contained "the bargain of the parties in fact," as expressed in "their language or [as could be] inferred from other circumstances . . ." *Id.* § 104.1201.2(c). The bargain was simple and standard: Ms. Schwalb borrowed money at interest, and agreed to repay it within 120 days.

Thus, the only question is whether the agreement also included collateral as security for repayment of the loan. Each pawn ticket definitively described the vehicle at issue, by make, model and VIN. The issue is thus whether the words "[y]ou are giving" adequately "create[] or provide[]" for a security interest in the vehicles. The safest and traditional words to accomplish this task are words of grant or assignment, such as "I hereby grant a security interest in X to secure repayment of my debt to you" or "I assign this property to you to secure what I owe you."[16]

In these phrases, the operative verbs – grant, assign, etc. – are in the present tense and indicate a present act. But the word used by the pawn ticket – "giving" – is not in the present tense but instead is the present participle of the verb "to give." Ms. Schwalb contends that use of the participle "giving" can only be read to refer to Pioneer's description of what Pioneer thought Ms. Schwalb had done or was doing – not as Ms. Schwalb's acknowledgment that she was engaging in a legally significant act. The analogy would be to something like noting that the statement "You are falling" describes an action taken by another rather than separately constituting the act of falling.

---

[15]Her signing each of the pawn tickets was sufficient authentication, as signing is a form of authentication under Article 9. Nev. Rev. Stat. § 104.9102.1(g)(1).

[16]In a world long forgotten, words such as "assign" and "transfer" referred solely to transactions in personal property, and words such as "convey" exclusively applied to real property. *See, e.g.,* Vann v. Edwards, 135 N.C. 661, 47 S.E. 784, 787 (1904) ("The words 'convey and devise' are technical terms relating to the disposition of interests in real property. It would not be technically or legally correct to speak of *conveying* personal property by a verbal sale of it, or even by a writing, . . . ."). Such distinctions have long been treated as historical curiosities. *See, e.g.,* Des Moines County Agric. Soc. v. Tubbesing, 87 Iowa 138, 54 N.W. 68 (1893) ("The term 'grant,' in law, was originally applied to the conveyance of incorporeal hereditaments only. In modern use it has a far more extended application, and is said to be applied where anything is granted or passed from one to another.").

But this is a quibble.  While a description may not be the act it describes, by signing the pawn ticket Ms. Schwalb acknowledged and adopted the act it described – giving a security interest.  Moreover, the statutory verbs are "creates" *or* "provides."  Even if the language did not "create" the security interest as Ms. Schwalb contends, it certainly did provide for "giving" one.

The insistence on formal words of grant or transfer is inconsistent with the structure and intent of Article 9.  As the Idaho Supreme Court noted with respect to the original version of Article 9:

> Courts have often repeated that no magic words are necessary to create a security interest and that the agreement itself need not even contain the term 'security interest.'  This is in keeping with the policy of the code that form should not prevail over substance and that, whenever possible, effect should be given to the parties' intent.

Simplot v. Owens, 119 Idaho 243, 245-46, 805 P.2d 449, 451-52 (1990), *quoting* Idaho Bank and Trust Co. v. Cargill, 105 Idaho 83, 87, 665 P.2d 1093, 1097 (Id. Ct. App. 1983).  *See also* Nolden v. Plant Reclamation (*In re* Amex-Protein Dev. Corp.), 504 F.2d 1056, 1059-60 (9th Cir. 1974) ("There is no support in legislative history or grammatical logic for the substitution of the word 'grant' for the phrase 'creates or provides for.'").[17]

The proper policy considerations are well stated by a leading commentator on Article 9: "There is no requirement for words of grant.  In fact, such a requirement smacks of the antiquated formalism the drafters were trying to avoid."  1 CLARK & CLARK, *supra*, at ¶ 2.02[1][c], at p. 2-16.[18]  *See also* 4 WHITE & SUMMERS, *supra*, at § 31-3 ("the drafters did not intend that specific 'words of grant' be required.").

Ms. Schwalb's further argument that she did not understand the import of the words she subscribed to is also unavailing.  Even though they appear in tiny five-point type, the words are discernable as an integral part of the pawn ticket.  It has long been the common law rule that signing a document authenticates and adopts the words it contains, even if there was a lack of subjective understanding of the words or their legal effect.  In essence,  people are presumed to be bound by what they sign.  Campanelli v. Conservas Altamira, S.A., 86

---

[17]The confusion over the necessity of formal words of grant or conveyance can be traced to the early decision in American Card Co. v. H.M.H. Co., 97 R.I. 59, 196 A.2d 150 (1963), which was read to require formal words of grant or transfer.  As recently noted, *American Card*'s "'express grant rule' has been fiercely criticized and ultimately rejected."  Bank of America v. Outboard Marine Corp. (*In re* Outboard Marine Corp.), 300 B.R. 308, 321 (Bankr. N.D. Ill. 2003).  Grant Gilmore, one of the principle architects of original Article 9, was similarly harsh in his criticism of *American Card*: "Certainly, nothing in § 9-203 requires that the 'security agreement' contain a 'granting' clause. . . .The Rhode Island court gives it an effect reminiscent of the worst formal requisites holding under the 19th century chattel mortgage acts."  1 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY, § 11.4, at pp. 347-48 (1965).

[18]The author concludes, however, that the consequences are sufficiently severe that "any creditor in his right mind will avoid the problem by including formal words of grant in a separate security agreement form."  CLARK & CLARK, *supra*, at ¶ 2.02[1][c], at p. 2-16.

Nev. 838, 841, 477 P.2d 870, 872 (1970) ("when a party to a written contract accepts it is (*sic*) a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them . . . ."), *quoting* Level Export Corp. v. Wolz, Aiken & Co., 305 N.Y. 82, 87, 111 N.E.2d 218, 221 (1953), *quoting* Metzger v. AEtna Ins. Co., 227 N.Y. 411, 416, 125 N.E. 814, 816 (1920).[19]

Ms. Schwalb contends that cases such as Expeditors Int'l of Washington, Inc. v. Official Creditors Comm. (*In re* CFLC, Inc.), 166 F.3d 1012 (9th Cir. 1999) require a finding of a subjective intent to grant security, an intent that she contends is lacking here.[20] In particular, she points to the following quotation from *CFLC* in support of her position:

> Determining whether the parties intended to create a security interest is a two-step process. The court must find both language in a written agreement that objectively indicates the parties' intent to create a security interest and the presence of a subjective intent by the parties to create a security interest.

*Id*. at 1016.

This quotation appears at odds with Nevada's common law of contracts set forth above. Yet upon examination, this antinomy dissolves. In *CFLC*, a shipping concern, Expeditors, handled CFLC's domestic and international shipping needs. Concurrently with Expeditors' receipt of goods to ship, Expeditors issued invoices to the debtor, CFLC, Inc.,[21] that contained the following language: "The Company [Expeditors] shall have a general lien on any and all property (and documents relating thereto) of the Customer [CFLC], in its

---

[19]As summarized by the late Professor Farnsworth with respect to the common law of contracts:

> The fact that one gives the matter no thought does not impair the effectiveness of one's assent, for there is no requirement that one intend or even understand the legal consequences of one's actions. For example, one who signs a writing may be bound by it, even though one neither reads it nor considers the legal consequence of signing it. This rule, making a party's intention to be legally bound irrelevant, has the salutary effects of generally relieving each party to a dispute of the burden of showing the other's state of mind in that regard and of helping to uphold routine agreements.

1 E. Allan Farnsworth, Farnsworth on Contracts § 3.7 (2d ed. 2001).

[20]Debtor's argument is based upon her testimony that her understanding of the transaction was that her failure to pay the debt when due would only disable her from selling the vehicle without paying Pioneer; she testified at trial that she did not think that Pioneer could take the vehicles "because I never gave them an extra set of keys."

[21]The debtor had formerly been known as Everex Systems, and most of Expeditors transactions with the debtor occurred when the debtor was known by that name. *CFLC*, 166 F.3d at 1014.

possession, custody or control or en route, for all claims for charges, expenses or advances incurred by the company in connection with any shipments of the Customer . . . ." *Id.* at 1014.

Over the course of several years, Expeditors sent 330 such invoices to CFLC. CFLC never signed any of them, and it did not discuss or take special note of the terms found in them. *Id.* When CFLC filed for bankruptcy, Expeditors had possession of goods it was transporting for CFLC, and Expeditors ultimately sued to assert its claimed lien on those goods. *Id.* at 1014-15.

The Ninth Circuit found that the unsigned invoices did not meet the requirements of California's version of Section 9-203.[22] Initially, and most importantly, CFLC did not sign any of the invoices, so the requirement of a signed security agreement was not met. *Id.* at 1016. When pressed with the argument that CFLC had evidenced an intent to be bound by the invoice's provision of a security interest, the Ninth Circuit responded:

> [W]e decline to apply course of dealing analysis to non-Article 2 transactions in which there has been only a tacit acceptance of a contract term repeatedly sent to the offeree on a pre-printed form. Even under the common law, "silence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance."

*Id.* at 1018, *quoting* Southern Cal. Acoustics Co. v. C.V. Holder, Inc., 71 Cal.2d 719, 722, 79 Cal. Rptr. 319, 456 P.2d 975, 978 (1969). Put another way, the Ninth Circuit was unwilling to find either objective or subjective manifestation of intent to be bound from a course of dealing.

In the present case, of course, Ms. Schwalb signed each pawn ticket, distinguishing this case from *CFLC*. Her signatures were each authentications; that is, each signature signaled her assent to the contract and her agreement to be bound by its terms; that is the common law understanding of what it is to "sign" a contract. *See, e.g., Campanelli*, 477 P.2d at 872; FARNSWORTH, *supra*, at § 3.7. As "signing" is "authentication" under the UCC, § 9-102(a)(7)(A), Ms. Schwalb's signatures effectively authenticated each pawn ticket within the meaning of Section 9-203. Because each pawn ticket adequately described the collateral covered by listing its VIN number, see § 9-108(b), Ms. Schwalb's signature thus completed the requirements of Section 9-203(b)(3)(A). Under *CFLC* and the UCC, then, Pioneer's interest attached upon such authentication.[23]

---

[22]*CFLC* dealt with California's pre-2001 version of Section 9-203, but there are no significant differences between the version discussed in *CFLC* and the revised Nevada version at issue here.

[23]Ms. Schwalb also contends that she signed the certificates of title over to Pioneer at a later date, thus depriving any agreement to grant security of validity for lack of any legal consideration. This argument misapprehends the facts. The pawn ticket, without more, constituted a legally sufficient security agreement. Consideration was present because Pioneer extended credit on the basis of Ms. Schwalb's promise to repay the loan and upon her grant of security. The signatures on the certificates of title would be relevant only with respect to the timing of perfection, a legal issue not relevant here. Moreover, even if the loan had been initially made on an unsecured basis, and later secured, such "past consideration" – while insufficient to validate a simple contract – is sufficient to

### b.    Attachment Based on "Constructive Possession" of the Certificates of Title

Pioneer argues in the alternative that its security interest attached through constructive possession of the vehicles, which was accomplished by possession of the certificates of title. Although at least one court has accepted a form of this argument, Floyd v. Title Exch. & Pawn of Anniston, Inc., 620 So. 2d 576 (Ala. 1993),[24] it does not square with tradition, commercial practice or Nevada law.

In commercial parlance, a record or writing stands proxy for goods it covers only if it is a "document of title" as defined in Article 1 of the UCC.  That definition states:

"Document of title" means a record:
(1) That in the regular course of business or financing is treated as adequately evidencing that the person in possession or control of the record is entitled to receive, control, hold and dispose of the record and the goods the record covers; and
(2) That purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass. . . .

NEV. REV. STAT. § 104.1201.2(p).

Documents of title, as defined, include warehouse receipts, bills of lading and the like. Id.  Commercial parties deal with these documents as if they were dealing with the goods themselves; indeed, Article 9 allows perfection of goods covered by a negotiable document to be perfected by possession of that document.  NEV. REV. STAT. § 104.9312.3.

---

provide "value" for purposes of Section 9-203.  See NEV. REV. STAT. § 104.1204.2.

[24]At issue in Floyd was whether possession of endorsed certificates of title and a spare set of keys for a car was "constructive possession" of the car sufficient to bring the transaction within Alabama's pawnbroker law (which had the collateral effect of permitting the lender to charge higher interest rates).  The court held, by a 5-2 vote, that because the lender's acts were not excluded from the pawnbroker law, the transaction was governed as "tangible personal property."  620 So.2d at 579. In the present case, of course, Pioneer did not retain a separate set of keys to the vehicles (thus depriving Pioneer of immediate access to the vehicles and lending to the impression that Ms. Schwalb remained the residual owner).  In addition, Floyd also recognized its limitations, noting that "[w]hether actual physical possession of the personal property itself is necessary to retain a perfected, superior lien in the property is not an issue before the court."  Id.

Another case from Alabama, Blackmon v. Downey, 624 So. 2d 1374 (Ala. 1993), has a similar holding. Blackmon dealt with the effect of regulatory classification.  It technically held that because certificates of title were not excluded from Alabama's statute defining pledged goods, the business of lending on certificates of title could be engaged in by pawnbrokers, and confirmed that such activity be regulated as would traditional pawns.  That meant that title pawn transactions could be entered into at a higher rate – 25% of the principal amount of the transaction per month – rather than the lower rate – 2% to 3% per month – authorized by Alabama's Small Loan Act.  624 So. 2d at 1376.

But the automobile certificates of title here bear little resemblance to the documents of title described in Article 1.  Certificates of title do not serve the commercial purpose of standing proxy for vehicles; they are generally held by the owner or lienholder of the car, not a bailee who controls the goods as its business.  This is not particularly surprising.  Certificate of title statutes were not designed to facilitate commerce; rather, they are regulatory and anticrime statutes that allow "big-ticket" items such as cars to be tracked by law enforcement authorities.  LYNN M. LOPUCKI & ELIZABETH WARREN, SECURED CREDIT: A SYSTEMS APPROACH 406 (6th ed. 2006) ("Certificates of title are part of a complex system that serves a variety of purposes, most unrelated to secured credit.  Certificates of title are part of the system by which the police identify the owner of a vehicle that is involved in an accident, lost, stolen, or used in the commission of a crime.  Certificates of title are also used to transfer ownership of motor vehicles and to keep track of successive annual registrations and taxation of vehicles.").

Indeed, although Article 9 brings certificates of title into its system, it is only to provide a proxy for the financing statement, not the vehicle.  In most states, the only way to perfect an interest in a car or other vehicle is to note the secured party's interest on the certificate of title.  Except in rare circumstances, possession of the car will not perfect the already-attached secured party's security interest.  NEV. REV. STAT. § 104.9313.2.[25]  The upshot of this is that mere possession of the certificate of title is of little legal significance under Article 9; that possession neither creates a security interest nor perfects one otherwise granted in the vehicles.  *See, e.g.*, Lee v. Cox, 18 U.C.C. Rep. Serv. 807, 21 Fed. R. Serv. 2d 828 (M.D. Tenn. 1976) (possession of registration certificates for eight Arabian horses did not perfect interest in horses).  At best, Pioneer possessed the certificates of title for what they were worth – which is not much, as it turns out; their possession facilitated Pioneer's perfection of its interests as will be seen, but it did not assist Pioneer in divesting Ms. Schwalb of her interests.

Pioneer's interests were thus attached, but that alone is insufficient in this case.  While attachment may make the security interest enforceable against the debtor, more is needed when the debtor is a debtor in bankruptcy.  What is required in the later case is that the security interest be good against the world.  The process by which such validity is obtained is referred to in Article 9 as perfection.

**2.    Perfection**

A security agreement "is effective according to its terms between the parties, against purchasers of the collateral, and against creditors," so long as a contrary result is not specified elsewhere in the UCC.  NEV. REV. STAT. § 104.9201.1.  Although not immediately obvious, one of the key restrictions on this provision is that, to be effective against lien creditors and purchasers, the security interest must be perfected.  *Id.* §§ 104.9317.1; 104.9317.2.  The UCC tells us that the default method of perfection is by filing a financing statement.  *Id.* § 104.9310.1.

---

[25]That rare circumstance is when a secured party initially perfects correctly by noting its interest on the certificate of title, and the debtor moves to another state and does not submit the paperwork during the time required by the destination state's law, or four months, whichever is sooner.  NEV. REV. STAT. § 104.9316.5.  Only then may a secured party perfect by taking possession of the car.  *See also* 4 WHITE & SUMMERS, *supra*, at § 31-8(c).

An exception exists for items such as the vehicles involved here.  If, as here, the collateral is subject to a certificate of title statute, Article 9 requires compliance with the state certificate of title statute for perfection.  *Id.* § 104.9311.1(b).  In Nevada, that requires reference to Chapter 482 of the Nevada Revised Statutes, which indicates that perfection occurs when there is "[c]ompliance with the applicable provisions of Nev. Rev. Stat. 482.423 to 482.431," Nev. Rev. Stat. § 482.432, which includes delivery of information regarding any secured party, and issuance of a certificate of title showing the secured party as a lienholder.  *Id.*

Here, the manner in which Ms. Schwalb delivered the certificates of title to Pioneer facilitated perfection.  Although the exact date when it occurred is in dispute, Ms. Schwalb testified that at some point she signed the certificates of title in blank, and then gave them to Pioneer.  Pioneer held the certificates until default (thus adopting the risky strategy of being secured but unperfected during this time).  It then exchanged them at the DMV, initially for certificates showing Pioneer as lienholder, and then ultimately for certificates showing Pioneer as owner.

As a result, when Pioneer initially went to the Department of Motor Vehicles in February of 2004, it became perfected no later than the time when it received the new certificates of title showing it as a lienholder.[26]

### 3.    Enforcement

Perhaps the key difference that attends the application of Article 9 to the transactions at issue lies in how Pioneer may enforce its security interest.  Its contract, the pawn ticket, is explicit.  It states that:

> In the event of failure to pay the loan with 120 days from date hereof, you shall thereby forfeit all right and title unto such pawned property to the pawnbroker who shall thereby acquire an absolute title to the same.

Before Ms. Schwalb filed her case, Pioneer sought to enforce this clause by first applying to be listed as the owner on the certificates of title, and then by filing a state court action seeking possession of the vehicles.

### a.    *Unenforceable Forfeiture Clause*

Pioneer continues to seek enforcement of this forfeiture clause as written.  It asserts that both vehicles belong, in all senses of that word, to it and to it alone.  This assertion is misguided.  Article 9 prohibits the waiver by debtors of certain provisions.  In particular, Section 9-602 contains a long list of provisions that "the debtor . . . may not waive or vary." Nev. Rev. Stat. § 104.9602.  These include the provisions regarding: the obligation to proceed

---

[26]The date Pioneer received the certificates of title was outside the 90-day preference period under 11 U.S.C. § 547, and thus there was no real possibility that perfection in either vehicle could be avoided under that section.

This opinion takes no position on whether, under Nevada law, an interest in a vehicle covered by Chapter 482 is perfected upon presentation of the appropriate paperwork to the DMV, upon issuance of the revised certificate by the DMV, or upon the secured party's receipt of the reissued certificate.

in a commercially reasonable manner, *id.* § 104.9602.7, strict foreclosure, *id.* § 104.9602.10, and the debtor's right to redeem the collateral, *id.* § 104.9602.11.[27]

If the parties sign a security agreement containing prohibited waivers, and then seek to enforce them, courts most often remedy violations of Section 9-602 by simply reading the relevant documents as if the offending clause had never been included.  They then assess the parties' conduct under the remaining provisions and the default standards set forth in Article 9.  *See, e.g.,* AAR Aircraft & Engine Group, Inc. v. Edwards, 272 F.3d 468, 472 (7th Cir. 2001) (waiver of duty to proceed in commercially reasonable manner unenforceable); Tropical Jewelers, Inc. v. NationsBank, N.A., 781 So. 2d 381, 384 (Fla. Dist. Ct. App. 2000) (same); Fleming v. Carroll Pub. Co., 581 A.2d 1219, 1223 (D.C. 1990) (parties signed document denominated a "lease" that allowed lessor to take leased goods without notice; court finds that Article 9 applies, and that lessor/secured party could not rely on provision dispensing with notice, and held that provision to be unenforceable); Prescott v. Thompson Tractor Co., 495 So.2d 513, 517 (Ala. 1986) (predecessor to Section 9-602 precludes waiver by a debtor of the right to notification of the disposition of collateral); Barber v. LeRoy, 40 Cal. App. 3d 336, 342-43, 115 Cal. Rptr. 272, 277 (Ct. App. 1974) (provision allowing secured party to bid at private sale void as against public policy and unenforceable); C.I.T. Corp. v. Haynes, 161 Me. 353, 356, 212 A.2d 436, 438 (1965) (waiver of right of redemption in conditional sales contract subject to Article 9 unenforceable as against public policy).

These provisions are of special concern in consumer transactions.  As noted in the official comments to Section 9-602:

> our legal system traditionally has looked with suspicion on agreements that limit the debtor's rights and free the secured party of its duties.  As stated in former Section 9-501, Comment 4, "no mortgage clause has ever been allowed to clog the equity of redemption."   The context of default offers great opportunity for overreaching.  The suspicious attitudes of the courts have been grounded in common sense.  This section, like former Section 9-501(3), codifies this long-standing and deeply rooted attitude.   The specified rights of the debtor and duties of the secured party may not be waived or varied except as stated.

Cmt. 2, UCC § 9-602.

This wariness has been, for the most part, reflected in academic commentary on this subject.  *See, e.g.,* Barkley Clark, *Default, Repossession, Foreclosure and Deficiency: A Journey to the Underworld And a Proposed Salvation,* 51 ORE. L. REV. 302, 303 (1972)(noting that a consumer "is as likely to read (let alone understand) [a security agreement] as he is to run windsprints in Red Square"); Michael M. Greenfield, *The Role of Assent in Article 2 and Article 9,* 75 WASH. U. L.Q. 289, 300 (1997) (arguing that a consumer's waiver of a statutory right at the time of

---

[27]The statute also prohibits a secured party's attempt to extract waivers of these antiwaiver provisions, NEV. REV. STAT. § 104.9602.12, and any attempt to disclaim liability for violations of Article 9's provisions.  *Id.* § 104.9602.13.

1    contract formation "is highly suspect" and that the "small-print boilerplate" language of the
2    waiver makes a consumer's assent "a fiction").[28]

     ### b.    Violations of Part 6 of Nevada's Article 9

3
4        If enforced as written, the pawn ticket forfeiture provisions would not only have
     waived and varied, but they would have effectively obliterated, Ms. Schwalb's right to
5    prohibit Pioneer's strict foreclosure of her interest in the vehicles, as well as her right to
     redeem the vehicles after default and repossession.    NEV. REV. STAT. §§ 104.9602.10;
6    104.9602.11.  But under Section 9-602, these rights may not be waived or varied by private
     agreement.  The result of this clash is that, in accordance with the prevailing law under
7    Article 9 cited above, the pawn tickets will have to be enforced without reference to their
     forfeiture provisions.

8        What effect does that erasure have?  Initially, it makes Article 9's default standards,
9    rather than the pawn tickets' forfeiture provisions, applicable to Pioneer's action in
     attempting to dispose of the vehicles.[29]    Given the parties prepetition dealings, this legal
10   conclusion has bite, as will be seen later.  See Section IV.B.2, infra.  But for the present
     analysis, it means that Pioneer was obligated to proceed as to the vehicles in the manner
11   required by Part 6 of Article 9.  This it did not do.  Because violations of Part 6 take on a
     significant role later in this opinion, it is appropriate to catalog the more egregious of
12   Pioneer's violations.

13       The cornerstone duty placed on every secured party is the obligation to proceed in a
14   commercially reasonable manner.  Article 9 expresses this by requiring that "[e]very aspect
     of a disposition of collateral, including the method, manner, time, place and other terms,
     must be commercially reasonable."  NEV. REV. STAT. § 104.9610.2.

15       Although proceeding by judicial action may be commercially reasonable in some case,
16   the manner in which Pioneer proceeded here was not.  It sought judicial vindication as the
     sole owner of the vehicles, a status it claimed through operation of the forfeiture clause in its
17   pawn ticket.  Such forfeitures are authorized in some circumstances, and are referred to as
     "strict foreclosures."  See NEV. REV. STAT. § 104.9620.

18   _____

19       [28]Some disagree.  See Edward J. Heiser, Jr. & Robert J. Flemma, Jr., Consumer Issues in the Article
20   9 Revision Project: The Perspective of Consumer Lenders, 48 CONSUMER FIN. L.Q. REP. 488, 493 (1994)
     (arguing that "[t]he idea that a consumer debtor is unsophisticated and completely at the mercy of
21   secured parties ignores reality"); James J. White, Work and Play in Revising Article 9, 80 VA. L. REV.
     2089, 2095 (1994) (urging the drafting committee to "purge the idea of the noble consumer who
22   borrows in ignorance, who is surprised by repossession and deficiency judgment, and who claims
     incredible promises by his creditor" because "the consumer class overflows with liars and cheats.").

23       [29]Pioneer argues that Ms. Schwalb still has the vehicles, and thus there was no disposition and
24   thus no violation of Article 9.  A "disposition," however, need not be of all the debtor's rights in the
     collateral.  After default, Section 9-610 authorizes the secured party to "sell, lease, license, or otherwise
25   dispose" of the collateral, indicating that "disposing" of collateral is the parting with any full or
     partial interest in the collateral.  In addition, Article 9 recognizes that a violation of Article 9 may
26   serve as the basis for an injunction against disposition, UCC § 9-625(a), thus indicating that violations
     of Article 9 and non-complying dispositions are similar, but not identical, concepts.

But a secured party's ability to engage in a strict foreclosure with respect to a consumer is heavily circumscribed. In particular, a secured creditor may not strictly foreclose on consumer goods without the consumer's consent, NEV. REV. STAT. § 104.9620.1(a), and may not strictly foreclose on any collateral that it does not possess, *id.* § 104.9620.1(c). Neither of these conditions is present here, thus making Pioneer's attempts to strictly foreclose on the vehicles violations of Part 6 of Nevada's Article 9.

In addition, when Pioneer proceeded in state court as if the vehicles were its sole property, Pioneer violated its duty to give Ms. Schwalb the option to force a public disposition, and deprived her of the opportunity to redeem. NEV. REV. STAT. §§ 104.9602.10; 104.9602.11. Proceeding in this contrary-to-law manner was perforce not commercially reasonable.

There were other violations. Article 9 is explicit that a secured party must notify a debtor before any disposition, NEV. REV. STAT. § 104.9611.2, and is explicit on what that notice must contain. *Id.* § 104.9613.1.[30] But Pioneer could not produce any notice that it sent to Ms. Schwalb, and she could not locate any notice she received from Pioneer. The parties, however, stipulated that Pioneer generally sends a notice to its borrowers on a standard form, and that they had no reason to believe that Pioneer did not send a notice on this standard form to Ms. Schwalb. Pioneer then produced an exemplar of that standard form. While the form appears to contain many of the required disclosures, it does not contain all of the required provisions.[31] In particular, the notice violates NEV. REV. STAT. § 104.9612.1(d),

_____

[30]NEV. REV. STAT. § 104.9613, which applies to all transactions except consumer-goods transactions, applies here rather than NEV. REV. STAT. § 104.9614, which applies to consumer-goods transactions. The difference, obviously, turns on whether the creation of the security interest occurred in a "consumer-goods transaction." Article 9 defines "consumer-goods transaction" as:

> a consumer transaction to the extent that: [¶] (1) A natural person incurs an obligation primarily for personal, family or household purposes; and [¶] (2) A security interest in consumer goods or in consumer goods and software that is held or acquired primarily for personal, family or household purposes secures the obligation.

NEV. REV. STAT. § 104.9102.1(x). While the vehicles are consumer goods as used by Ms. Schwalb, *see* text at note 39, *infra*, the loan was not incurred for personal, family or household purposes; it was instead incurred to obtain funds to invest in a business. Borrowing to invest or contribute to a business is not borrowing for "personal, family or household" purposes. *Cf.* Runski v. Cypher Chiropractic Center (*In re* Runski), 102 F.3d 744, 747 (4th Cir. 1996) (equipment held in individual's name but used in business not held for personal use within meaning of 11 U.S.C. § 722; "debt incurred for a business venture is not 'consumer debt' because it is not 'debt incurred by an individual primarily for a personal, family, or household purpose.'"); Zolg v. Kelly (*In re* Kelly), 841 F.2d 908, 913 (9th Cir. 1988) (under 11 U.S.C. § 707(b), "[d]ebt incurred for business ventures or other profit-seeking activities is plainly not consumer debt. . . .").

[31]NEV. REV. STAT. § 104.9613 requires generally that the notice specify: the debtor; the secured party; the collateral; the method of intended disposition; the statement that the debtor is entitled to an accounting; and either the time and date of any public disposition, or the date after which any other disposition is to be made. Here, as indicted in text above, the form introduced into evidence

which requires that any notice contain a statement that "the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting."[32]

Pioneer omitted this required disclosure, of course, because of Pioneer's belief in the validity of its forfeiture provisions, which did not mention any accounting. Pioneer's erroneous belief, even if in good faith, does not save it; there is no good faith defense to the failure to provide sufficient notice of a proposed disposition. *See, e.g.*, Kruse v. Voyager Ins. Cos., 72 Ohio St. 3d 192, 196-97, 648 N.E.2d 814, 817 (Ohio 1995) (failure to send notice to debtor was a violation of Article 9's notice provisions); Wilmington Trust Co. v. Conner, 415 A.2d 773, 776 (Del. 1980) (failure to give credit for finance charges paid but unearned in notice of disposition was violation of Article 9's notice provisions).

### c.    The Irrelevance of Non-Nevada Statutory Law

Despite this analysis under applicable Nevada law, Pioneer asserts that some states would give full effect to the forfeiture provisions of its pawn ticket, and that these decisions provide a basis for this court to rule similarly. Courts in Alabama, Georgia and Tennessee, for example, have held that upon expiration of the traditional pawnbroker's redemption period, the debtor loses all interest in the car, and the pawnbroker becomes the absolute owner. *See, e.g.*, Geddes v. Mayhall Enters., LLC (*In re* Jones), 304 B.R. 462 (Bankr. N.D. Ala. 2003); Bell v. Instant Car Title Loans (*In re* Bell), 279 B.R. 890 (Bankr. N.D. Ga. 2002); Dunlap v. Cash Am. Pawn, 158 B.R. 724 (M.D. Tenn. 1992).

These decisions, however, turn on nonuniform provisions of the applicable states' motor vehicle or pawnbroker laws. In Alabama, for example, the applicable statute provides that "Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker." ALA. CODE § 5-19A-6. This section, unlike anything in the Nevada statutes, unambiguously divests debtors of all their property rights when the redemption period expires.

Similarly, the applicable Georgia statute provides that "[p]ledged goods not redeemed within the grace period shall be automatically forfeited to the pawnbroker by operation of this Code section, and any ownership interest of the pledgor or seller shall automatically be extinguished as regards the pledged item." GA. CODE ANN. § 44-14-403(b)(3). This also clearly divests the debtor of any interest at the end of the redemption period.

Finally, the Tennessee pawnbroking statutes state that if the statutory redemption period has run, the statutory notice requirements have been met, and the pawned goods are not redeemed, the debtor forfeits "all right, title and interest of, in and to the pledged goods

---

omitted any statement regarding a right to an accounting. In addition, if notice was sent on the form introduced, it would appear to be inaccurate as well – it states that the debtor has to either pay the interest due or "pick-up [*sic*] the item(s)," which of course made no sense with respect to Ms. Schwalb since she still possessed the vehicles.

[32]Article 9 states that "accounting" means "a record: [¶] (1) Authenticated by a secured party; [¶] (2) Indicating the aggregate unpaid secured obligations as of a date not more than 35 days earlier or 35 days later than the date of the record; and [¶] (3) Identifying the components of the obligations in reasonable detail." NEV. REV. STAT. § 104.9102.1(d).

and the debt becomes satisfied." TENN. CODE ANN. § 45-6-211(e).    Again, this non-UCC statute terminates the debtor's interest in the goods pawned.

No Nevada statute, however, has similar provisions.    Neither Chapter 646 on pawnbroking nor Chapter 482 on motor vehicles contains any provision that permits or mandates forfeiture if the debtor does not redeem within a stated period of time.[33]  In such a vacuum, the only applicable statute that enables Pioneer to divest Ms. Schwalb of her equity of redemption in the vehicles would be Article 9 of the UCC.

    *D.    Summary*

Pioneer entered into two transactions with Ms. Schwalb that were and are subject to Article 9 of the UCC.  Pioneer believed that each transaction was a pawn of the vehicle, and thus thought that Article 9 did not apply.  Both of these beliefs were mistaken.   First, the transaction was not a traditional pawn of the vehicles.   Throughout her case and this litigation, Ms. Schwalb has retained possession of the vehicles.   Thus, the traditional basis of pawnbroking – possession of the collateral by the pawnbroker – is absent.

This absence also has significant consequences for Pioneer with respect to the applicability of Article 9.  Although the court expresses no opinion on the applicability of Article 9 to traditional possessory pawns, the nonpossessory financing in this case does come within Article 9.  Although Pioneer did not believe that Article 9 applies, the "substance over form" rules of Article 9 render that belief irrelevant.

Applying Article 9 to the parties' agreement – the pawn ticket – shows that some of its key provisions are unenforceable, and that Pioneer violated Article 9 in the manner in which it has proceeded in this matter.  The impact of those violations will be explored later, but first the nature and amount of Pioneer's claim in bankruptcy must be established.

## IV.    PIONEER'S CLAIMS IN BANKRUPTCY

A secured party's claim in bankruptcy differs from that claim under most nonbankruptcy law.  In bankruptcy, a claim's status as secured turns not only on the contractual or other relations between the parties, but also on the relationship between the value of the collateral and the amount of the debt.  Under Section 506(a): (i) a debt is fully secured if the value of the collateral exceeds the amount of the claim; (ii) a debt is unsecured notwithstanding a prepetition contractual grant of security if the collateral is worthless; that is, if its value is zero; and (iii) if the value of the collateral is greater than zero, but less than the amount of the secured party's debt, then the creditor has two claims: a secured claim equal to the collateral's value; and an unsecured claim for the difference between the amount of the claim and the collateral's value.

These standard rules are altered somewhat in this case, given Pioneer's strategy and the basic rules of chapter 13 administration.

---

[33]Section 646.050.2 simply states that "All personal property must be held for redemption for at least 120 days after the date of pledge with any pawnbroker."  This statute regulates only minimum redemption periods; it is silent on the consequences of the debtor's failure to redeem.

*A.     No Unsecured Claim*

As an initial matter, Pioneer concedes that, regardless of the collateral's value, it has no unsecured claim.  It reaches this position both as a matter of principle, and as a matter of procedure.  As a matter of principle, it argues that, given the forfeiture language in the pawn ticket, it is the owner of the vehicle and thus it is not a creditor.  It accordingly contends that it holds no claim, be it secured or unsecured.  As a matter of procedure, it followed up this contention by declining to file a proof of claim in this case.  Thus, even if its status at the commencement of the case had been that of a partially secured creditor, it would be barred from participating as an unsecured creditor given its failure to file a proof of claim.  IRS v. Osborne (*In re* Osborne), 76 F.3d 306, 308-309 (9th Cir. 1996); *In re* Tomlan, 102 B.R. 790, 791-92 n.1 (E.D. Wash. 1989), *aff'd per curiam,* 907 F.2d 114 (9th Cir. 1990); *In re* Lang, 196 B.R. 528, 530 (Bankr. D. Ariz. 1996).

*B.     Secured Claims*

Despite its refusal to file a proof of claim, Pioneer may still be treated as a secured creditor if that was its status at the time of bankruptcy filing.  This is because of the nature of security.   A security interest is an interest in property, and thus under the Fifth Amendment to the United States Constitution no act of Congress – the bankruptcy code or other legislation – can deprive a secured creditor of its property without due process.

In bankruptcy, this bedrock notion is often expressed by stating that a secured claim passes through bankruptcy unaffected absent some affirmative action to set it aside.  *See, e.g.,* Long v. Bullard, 117 U.S. 617, 620-21 (1886);  Dewsnup v. Timm, 502 U.S. 410, 418 (1992); County of Ventura v. Brawders (*In re* Brawders), 325 B.R. 405, 411 (B.A.P. 9th Cir. 2005) ("Absent some action by the representative of the bankruptcy estate, liens ordinarily pass through bankruptcy unaffected, regardless whether the creditor holding that lien ignores the bankruptcy case, or files an unsecured claim when it meant to file a secured claim, or files an untimely claim after the bar date has passed."); Shook v. CIBC (*In re* Shook), 278 B.R. 815, 824-25 (B.A.P. 9th Cir. 2002).

Since the court has determined that the pawn ticket's forfeiture provisions are unenforceable, that means that Ms. Schwalb is the owner of the vehicles and that, at best, Pioneer is a secured creditor. But to determine the extent of its secured claim, the court must determine the amount of the claim and the value of the collateral.

**1.     Allowed Amount of Claim**

The initial principal amounts of the loans are easy to calculate.  Pioneer lent $4,000 on the Infiniti, and $16,000 on the Cadillac.  From that point, as Nevada has no generally applicable usury limits,[34] prepetition interest ran at the rate of 120% on each loan until the

---

[34]NEV. REV. STAT. § 99.050 states that "[p]arties may agree for the payment of any rate of interest on money due or to become due on any contract, for the compounding of interest if they choose, and for any other charges or fees."  This language has been interpreted as meaning that there is no generally applicable usury law in Nevada.  Consumers Distrib. Co. v. Hermann, 107 Nev. 387, 393, 812 P.2d 1274, 1278 (1991).

1  filing date.[35]  As a consequence, as of filing, Pioneer's accrued interest claim on the Infiniti
2  loan was $3,629.59,[36] and its accrued interest claim on the Cadillac loan was $18,673.98.[37]
   When added to the original principal amounts, Pioneer's total claim outside of bankruptcy,
3  as of the petition date, was $42,303.57 – $7,629.59 on the Infiniti loan, and $34,673.98 on the
   Cadillac loan.

4       The amount due on each of the loans exceeds the value of the collateral taken for those
   loans.  As a result, Pioneer's secured claim, at least initially, is capped by the value of the
5  vehicles as of the proposed effective date of the chapter 13 plan.  11 U.S.C. § 506(a).

6           **2.      Effect of Pioneer's Violation of Article 9 on Its Allowed Claim**

7       At these levels of secured debt, Pioneer raises significant and serious questions of
   feasibility under 11 U.S.C. § 1325(a)(6).  For example, if a 10% interest rate and a 36-month
8  plan term are used, the monthly payment related to the Infiniti will be $243.72, and the
   payment related to the Cadillac will be $1,107.64 a month, for a monthly aggregate of
9  $1,351.36.  This amount exceeds the disposable income shown on Ms. Schwalb's plan.  But,
   as indicated below, Pioneer's violations of Article 9 work significant reductions in its claim.

10

11          *a.      Statutory Recovery Under NEV. REV. STAT. § 104.9625*

12      Under Article 9, there are significant consequences for failure to follow Article 9's
   provisions.  Section 104.9625.2 provides that "a person is liable for damages in the amount

13

14

15

---

16      [35]Since the amounts owed as of the filing date exceed, for both loans, the collateral's value, no
17  postpetition interest is allowable on Pioneer's claims.  11 U.S.C. § 502(b)(2) (disallowing interest that
   is unmatured as of the petition date).

18
       [36]Interest accrues on the Infiniti loan at 120% simple interest per year – under Nevada law,
19  lenders wishing compound interest must specifically provide for such interest, and silence in the
   contract, as here, results in a simple interest calculation.  Campbell v. Lake Terrace, Inc.,  111 Nev.
20  1329, 905 P.2d 163 (1995).

21      The last interest payment on the Infiniti loan was made on November 6, 2004.  As Ms.
22  Schwalb's bankruptcy was filed on August 9, 2005, some 276 days elapsed from the date of the last
   payment to the petition date.  Thus, Pioneer's contractual entitlement to interest is 276/365 of one
23  year's worth of interest.  One year's worth of interest would have been $4,800, so 276/365 of that
   amount is $3,629.59.

24
       [37]Interest accrues on the  Cadillac loan at 120% simple interest per year.  No interest payment
25  was ever made on the Cadillac loan.  As Ms. Schwalb's bankruptcy was filed on August 9, 2005, some
   355 days elapsed from the date of the loan to the petition date.  Thus, Pioneer's contractual
26  entitlement to interest is 355/365 of one year's worth of interest.  One year's worth of interest would
   have been $19,200, so 355/365 of that amount is $18,673.97.

of any loss caused by a failure to comply with this article." Ms. Schwalb offered to prove damages under this section, but did not introduce any evidence on this point.[38]

Notwithstanding this failure of proof, Ms. Schwalb may still have a remedy for Pioneer's failure to comply with the enforcement provisions of Article 9. The record firmly establishes numerous instances of Pioneer's noncompliance with Part 6 of Article 9. See Section III.C.3.b, *supra*. When such noncompliance exists, Section 104.9625.3(b) provides as follows:

> If the collateral is consumer goods, a person that was a debtor . . . at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation . . .

As characterized by Barkley and Barbara Clark, leading commentators on Article 9:

> This sanction has been characterized as both a minimum civil penalty and a liquidated damages provision. Its appeal is that it requires no showing of actual loss. . . . This minimum civil penalty, quietly tucked away in a corner of the statute, is probably the most glittering nugget of consumer protection found in all of Article 9.

CLARK & CLARK, *supra*, at ¶ 4.12[4], at pp. 4-335 to 4-336; *see also* 10 ANDERSON, *supra*, at § 9-507:166 ("Even if the consumer debtor cannot prove the actual damages sustained by the noncomplying sale of the collateral, the consumer debtor may recover the statutory minimum damages."); Davenport v. Chrysler Credit Corp., 818 S.W. 2d 23 (Tenn. Ct. App. 1991).

Does Section 9-625 apply in this case? Initially, it requires the collateral to be consumer goods. Article 9 defines these as goods held or used for "personal, family or household purposes." NEV. REV. STAT. § 104.9201.1(w). Ms. Schwalb testified that she used the vehicles to go to doctors, to run errands and to transport her daughter, and that her partner used them to go to work. This use qualifies as family, if not personal, use.[39]

---

[38] The comments indicate that a debtor might be able to maintain an action in tort based upon the violations. Cmt. 3, UCC § 9-625. At least one commentator has noted that this comment may be inconsistent with the text of the UCC. TIMOTHY R. ZINNECKER, THE DEFAULT PROVISIONS OF REVISED ARTICLE 9, at 169-70 (1999).

[39] In the uniform version of the consumer penalty provision, the heading for subsection (c) of Section 9-625 – which corresponds to subsection 3 of NEV. REV. STAT. § 104.9625 – indicates that Section 9-625(c)(2) applies to "statutory damages in *consumer-goods transaction*." (emphasis added). This might give rise to an argument that the damages apply can be obtained only in such transactions. But while captions in the official version of the UCC are part of the statute, UCC § 1-107, Article 9's subsection headings are not, *see* cmt. 3 to § 9-101. In any event, Nevada declined to adopt the uniform provision of article 1 that states that captions part of the text of the UCC, and thus this argument would be unavailing in Nevada.

In any event, the better reasoned position is that Section 9-625(c)(2), and its Nevada analog, NEV. REV. STAT. § 104.9625.3(b), apply when the collateral is consumer goods, and there is no need

There is also no doubt that Pioneer, as a secured party, failed to comply with Part 6 of Article 9. *See* Part III.C.3.b *supra*. This noncompliance can form the basis of an award under Section 9-625. *Cf.* Kruse v. Voyager Ins. Cos., 72 Ohio St. 3d 192, 648 N.E.2d 814 (1995) (even if disposition of collateral is commercially reasonable, when collateral is consumer goods, debtor may recover under predecessor of Section 9-625 if secured party fails to provide debtor with reasonable notice of sale of collateral as required by UCC); Erdmann v. Rants, 442 N.W.2d 441 (N.D. 1989) (award of statutory damages under predecessor of Section 9-625 when secured party failed to give notice, despite fact that sale was made in commercially reasonable manner); Garza v. Brazos County Fed. Credit Union, 603 S.W.2d 298 (Tex. Civ. App. 1980) (though secured party made small error with respect to notice and debtor proved, noncompliance with notice requirements justified penalty under predecessor to Section 9-625); Conti Causeway Ford v. Jarossy, N.J. Super. 382, 276 A.2d 402 (Dist. Ct. 1971), *aff'd* 118 N.J. Super. 521, 288 A.2d 872 (Ct. App. Div. 1972) (failure of notice justified penalty against seller under predecessor of Section 9-625).

Thus, the statutory minimum penalty of NEV. REV. STAT. § 104.9625.3 is applicable.[40] That means that the "credit service charge[s]" – essentially all the paid and accrued interest here – are damages to which Ms. Schwalb is entitled. *See, e.g.,* Knights of Columbus Credit Union v. Stock, 814 S.W.2d 427, 432 (Tex. App. 1991); Davenport v. Chrysler Credit Corp., 818 S.W.2d 23, 32 & n.7 (Tenn. Ct. App. 1991); 4 WHITE & SUMMERS, *supra*, at § 34-14(c) ("We interpret that sentence to grant damages equal to the total interest charge (irrespective of the amount that has been paid) in addition to 10% of the original principal amount of the debt, irrespective of how much of the principal has been repaid."). *See also* ZINNECKER, *supra*, at 170-71.

For the two loans, there is $22,303.56 of "credit service charge[s]." These charges consist of accrued but unpaid interest on both loans as of the filing, and $1,600 in interest actually paid on the Infiniti loan. In addition, the statutory damages include 10% of the principal amount of each loan. These amounts would be $400 for the Infiniti and $1,600 for the Cadillac. When added together, the interest and principal components of the statutory damages equals $25,903.56.

---

to make any further inquiry into whether the transaction is a "consumer-goods transaction." *See* Jean Braucher, *Deadlock: Consumer Transactions Under Revised Article 9*, 73 AM. BANKR. L.J. 83, 90-91 (1999); Marion W. Benfield, Jr., *Consumer Provisions in Revised Article 9*, 74 CHI.-KENT L. REV. 1255, 1260 n.18 (1999) ("[T]he statutory damages imposed by Revised section 9-625(c) for failure to comply with the foreclosure requirements of Revised Article 9 apply to a transaction in which the collateral is consumer goods. Its application is not limited to transactions in which the credit was extended for a consumer purpose.").

[40]None of the exceptions provided in NEV. REV. STAT. § 104.9628 apply here. Pioneer knew Ms. Schwalb's status as a debtor, knew her identity, and knew how to communicate with her.

28

This amount is calculated as follows:

| Recoverable Item | Infiniti Loan | Cadillac Loan | Total |
|---|---|---|---|
| Unpaid credit service charge | $        3,629.59 | $        18,673.97 | $        22,303.56 |
| Paid credit service charge | $        1,600.00 | | $        1,600.00 |
| 10% Principal amount | $        400.00 | $        1,600.00 | $        2,000.00 |
| Totals: | $        5,629.59 | $        20,273.97 | $        25,903.56 |

### b.    Offset Against Allowed Claim

There are two possible outcomes of the conclusion that Ms. Schwalb is entitled to a statutory remedy under NEV. REV. STAT. § 104.9625.3. The first is that the violation leads to an independent damages claim, which in turn would not affect the allowed amount of Pioneer's claims. Instead, the violation would give rise to the conclusion that Pioneer must pay damages to Ms. Schwalb's chapter 13 estate for distribution to her creditors. The second outcome would be that the amount of the statutory penalty would be applied to reduce Pioneer's allowed claims. In other words, the second method would allow Ms. Schwalb to recoup the amount of the statutory penalty against Pioneer's claim, reducing the amounts she would have to pay to Pioneer under the plan.

Here, recoupment is appropriate. The statutory penalty arises out of the same transactions and occurrences that gave rise to Pioneer's claims for money lent. As a result, an assertion that a penalty is appropriate under Section 9-625(b) would have to be joined as a compulsory counterclaim in any litigation regarding the repayment or collection of Pioneer's loan claims. The consequence of this conclusion is that, inasmuch as "[t]he provisions of a confirmed plan bind the debtor and each creditor," 11 U.S.C. § 1327(a), all issues under Section 9-625(b) would have had to have been raised at confirmation. Otherwise Ms. Schwalb would have possibly lost her ability to later raise the issue.

A reduction of Pioneer's claims by the amount of the statutory penalty adjusts and sets the amount owed by Ms. Schwalb. Unless reserved for another time, this reduction should thus be part of the confirmation process, the purpose of which is to adjust the various claims and counterclaims necessary to arrive at the final allowed amount of a creditor's claim. *Cf.* ZINNECKER, *supra*, at 175 (1999) ("To best advance the restoration goal of damage awards, revised § 9-625(d) should be interpreted in a manner that prohibits recovery of actual damages only *to the extent that* (rather than *if*) the deficiency is reduced or eliminated.") (emphasis in original).[41]

---

[41]Admittedly, Professor Zinnecker was commenting upon Section 9-625(d), which deals with a subject not present here: the interplay between deficiency actions, the subject of Section 9-626, and penalty actions, dealt with in Section 9-625. In commercial cases, Section 9-625(d) will likely not raise many problems in this area. In consumer cases, however, "the statute is intentionally silent" as to the appropriate relationship between the penalties and the amount of any deficiency. Donald J. Rapson, *Default and the Enforcement of Security Interests Under Revised Article 9*, 74 CHI-KENT L. REV. 893, 939 (1999). Under the facts present here, however, Section 9-625(d) underscores the need to net out all claims between Ms. Schwalb and Pioneer, and to ensure that Ms. Schwalb's plan provides for that net

To the extent that cases have considered the issue, that treatment is not uncommon.[42] *See, e.g.,* Stedman v. Webb (*In re* Stedman), 264 B.R. 298, 303 (Bankr. W.D.N.Y. 2001) (chapter 13 debtors allowed to offset damages for violation of duty to act in a commercially reasonable manner against secured creditor's claim); Coxall v. Clover Commercial Corp., 4 Misc. 3d 654, 667, 781 N.Y.S.2d 567, 578 (City Civ. Ct. 2004) (damages under Section 9-625 used to reduce debtor's accrued liability at time of Article 9 violation); Hartford-Carlisle Sav. Bank v. Shivers, 566 N.W.2d 877, 882-84 (Iowa 1997) (indicating that in cases of de minimis violations of Article 9, proper remedy is to deduct debtor's damages against any deficiency left after foreclosure and sale); Jones v. Morgan, 58 Mich. App. 455, 460, 228 N.W.2d 419, 423 (Ct. App. 1975) (damages awarded to a debtor for a creditor's commercially unreasonable conduct may be used to reduce amounts owed by the debtor to the creditor).

When these damages are recouped against Pioneer's claim, that leaves Pioneer with a claim of $2,000 on the Infiniti loan, and a claim of $14,600 on the Cadillac loan.[43]

### 3.    Determination of Secured Claim – Valuation of Collateral

Are these claims secured?  A secured claim in bankruptcy is defined by the value of its collateral.  11 U.S.C. § 506(a).  It thus makes sense to begin with the value of the two vehicles in determining whether Pioneer's claims are secured.  Valuation of motor vehicles under Section 1325(a)(5)(B) is governed by Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997).

Under *Rash*, the relevant valuation analysis under Section 1325(a)(5)(B) is what it would cost to replace the two vehicles.  *Rash* defined replacement value as what a willing buyer would pay a willing seller to obtain a car in the same condition as each of the two vehicles at issue here.  *Rash*, 520 U.S. at 959 at n. 2.  *See also* Mulvania v. IRS (*In re* Mulvania), 214 B.R. 1, 9-10 (B.A.P. 9th Cir. 1997); *In re* Marquez, 270 B.R. 761, 765-66 (Bankr. D. Ariz.

---

amount to be paid to Pioneer.

[42]It also is consistent with the policy of providing strong disincentives to violate Part 6 of Article 9. If recoupment were not allowed, secured creditors in Pioneer's position generally (although not in this case because Pioneer does not have an unsecured claim) might recover some of their damage payments when the chapter 13 trustee makes dividend payments from those funds to unsecured creditors.  This would effectively reduce Section 9-625's deterrent power.  *See* Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 723-24, 652 A.2d 496, 505 (Conn. 1995).

[43]Ms. Schwalb also alleged a violation of Chapter 598 of Nevada's Revised Statutes, alleging Pioneer's activities constituted a deceptive trade practice since they "[v]iolate[d] a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923.2. The court rules against Ms. Schwalb on this ground, given the disposition in text and its cursory allegations and insufficient proof adduced by counsel.  In any event, no Nevada court has ruled that private citizens have standing to sue for violations of Chapter 598. *Cf.* Edwards v. Emperor's Garden Restaurant, 130 P.3d 1280, 1288 n.38 (Nev. 2006) (declining to address standing to redress alleged violations of chapter 598 due to counsel's failure to brief subject). *But cf.* Nev. Rev. Stat. § 41.600.2(e) (providing for private cause of action for a person who is a victim of consumer fraud and defining "consumer fraud" to include "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.").

2001).  In short, Ms. Schwalb's plan must pay, over time, an amount equal to the present value of the replacement cost of each vehicle.

### a.    Evidence

Ms. Schwalb initially contends that the value of the collateral should be limited to the amounts lent against each vehicle.  She attempts to justify this position by arguing that Pioneer's economic decisions to lend $4,000 against the Infiniti and $16,000 against the Cadillac establish those amounts as the vehicles' value for this proceeding.

The argument is risible.  There was no evidence that Pioneer lent 100% of the vehicles' value, and certainly no evidence establishing that these low values were the two vehicles' replacement values.  Indeed, the evidence was that Pioneer's normal practice was to lend approximately 30% of the value of vehicles.  This would put, at least as of the time of the loans, the range of replacement values at around $13,333 for the Infiniti and $53,333 for the Cadillac.

Of more weight is Ms. Schwalb's own estimation of values at trial of about $6,000 for the Infiniti and $25,000 for the Cadillac.  Indeed, on Ms. Schwalb's schedules filed in this case, which speak as of her petition date, she stated under penalty of perjury that, at the time of filing, the Infiniti was worth $6,500, and the Cadillac was worth $30,000.

### b.    Timing

Each of these estimates has its own strengths and weaknesses, but in the end they present one problem – they value the collateral at different dates.  This variance is, unfortunately, reflected by the cases on valuation.  Some cases value as of the petition date, *e.g.,* Chase Manhattan Bank v. Stembridge (*In re* Stembridge), 394 F.3d 383, 387 (5th Cir. 2004); others value the property as of the date of the trial or hearing at which valuation is an issue, *e.g.,* Winston v. Chrysler Fin. Corp. (*In re* Winston), 236 B.R. 167, 171 (Bankr. E.D. Pa. 1999); still others pick the effective date of the plan, and provide adequate protection under Section 361 to the secured creditor for any gap between filing and the effective date, *e.g., In re* Farmer, 257 B.R. 556, 560-61 (Bankr. D. Mont. 2000); *In re* Davis, 215 B.R. 824, 825-26 (Bankr. N.D. Tex. 1997).  *See also* LUNDIN, *supra*, at § 107.1, at p. 107-1 (3d ed. 2002 & Supp. 2004) ("There is little agreement in the reported cases on the date for fixing the value of collateral in Chapter 13 cases.").

Fortunately, this court need not decide this issue.  In each case, the allowed amount of Pioneer's claim, as set forth above, is less than either valuation.  So each claim is fully secured; the claim secured by the Infiniti is an allowed claim for $2,000, and the claim secured by the Cadillac is a secured claim for $14,600.[44]

---

[44]They may be oversecured claims, but they will not accrue interest.  Under NEV. REV. STAT. § 104.9625.3(b), all interest charged is recoverable by Ms. Schwalb as a reduction of Pioneer's claims due to Pioneer's violations of the enforcement provisions of Article 9.  Thus, while interest will technically accrue under Section 506(b), each dollar of accrued interest is offset by a dollar of debtor's damages.

## V.    EFFECT OF DEBTOR'S PLAN

As indicated above, Ms. Schwalb proposes to "cramdown" Pioneer's claim over 36 months at a 10% rate of interest. She contends that this treatment complies with 11 U.S.C. § 1325(a)(5)(B) in that the stream of payments will return to Pioneer the present value of its claim as of the effective date.

### A.    Treatment of Secured Claim

Section 1325(a)(5)(B) requires that a chapter 13 plan pay to a secured creditor the present value of its claim; that is the import of requiring the amount to be valued "as of the effective date" of the plan. This is typically done by paying the secured creditor's claim over the life of the plan – in this case 36 months – with a market rate of interest. Here, Ms. Schwalb has proposed 10% interest, and Pioneer has not objected. As a result, the amount of Pioneer's allowed secured claims is known – $2,000 and $14,600 – as is the rate at which the payment stream will be discounted – 10%. When calculated for debtor's 36-month plan, these factors yield a $63.89 monthly payment for the Infiniti loan, and a $466.39 monthly payment for the Cadillac loan, for a total of $530.28 per month.

### B.    Feasibility

Pioneer contends that Ms. Schwalb's necessary reliance on her father's donations renders her plan infeasible.[45] Pioneer cites to cases such as *In re* Crowder, 179 B.R. 571 (Bankr. E.D. Ark. 1995) and *In re* Porter, 276 B.R. 32, 38 (Bankr. D. Mass. 2002) for the proposition that voluntary contributions by relatives are never sufficient to establish Section 1325(a)(6)'s requirement that, to confirm a plan, the court must find that "the debtor will be able to make all payments under the plan . . . ."

Although reliance on donations is heavily disfavored, neither *Crowder* nor *Porter* constitute categorical bars against the use of donations from relatives. In *Crowder*, the court was unconvinced of the stability and long-term willingness of the debtor's father to fund the plan. As Judge Scott stated, "There was no affirmation by [the father] as to any specific amount to be provided or that any specific assistance would continue for the duration of the plan. Indeed, he stated that he was not prepared 'right now' to render assistance other than that currently being provided." 179 B.R. at 574. In *Porter*, the court noted that there was no "evidence of regular contributions having been made in the past." 276 B.R. at 38.

But in the present case, Ms. Schwalb's father testified convincingly that he would pay whatever it took to confirm the plan and make all plan payments, indicating that he would be willing to sign a contract obligating him to make these payments. He has a long and undisputed history of providing for his daughter; indeed, he gave her the vehicles that form the basis of this lawsuit, and he has provided for her necessary well-being for many years.

---

[45]It also raises issues of eligibility with respect to the status of such donations as "regular income," but Pioneer does not press that point. *See, e.g., In re* Crowder, 179 B.R. 571, 573-74 (E.D. Ark. 1995); *In re* Felberman, 196 B.R. 678, 685-86 (Bankr. S.D.N.Y. 1995) ("'[A]s a general proposition, gratuitous payments to a [chapter 13] debtor by his relatives do not constitute regular income,' although there may be unique circumstances when family contributions may be reliable enough to be considered 'regular income.'"), *quoting In re* Campbell, 38 B.R. 193, 196 (Bankr. E.D.N.Y. 1984).

1

2       The sufficiency of Mr. Schwalb's undertaking was under some stress when Pioneer's
        secured claim appeared to be in excess of $45,000.  As reduced, however, there is no serious
3       contention that he is unable to make the necessary payments; indeed, he has been making
        payments since case was filed, and this history of commitment, together with his even longer
        commitment to his daughter's financial well-being, is sufficient to find that all payments
        under the plan will be made and that Section 1325(a)(6) has been satisfied

4

5   VI.  **CONCLUSION**

6       Article 9 governs this case.  As a result, Pioneer loses on its ownership claims as to the
        two vehicles.  In addition, the application of Article 9 means that all Pioneer has by way of
7       a property interest in the vehicles is a perfected security interest.  This application of Article
        9, however, also has a second, and similarly adverse, consequence: because of Pioneer's
        violations of Article 9, Pioneer's claim against Ms. Schwalb will be significantly reduced.

8

9       Cramdown of Pioneer's claims, as reduced, is feasible for Ms. Schwalb as assisted by
        her father.  As the ownership issues and the feasibility issues were the only issues seriously
10      contested by the parties, Ms. Schwalb must amend her plan consistent with this opinion, and
        when so amended the court will confirm it.  This opinion constitutes the findings of fact and
11      conclusions of law under FED. R. BANKR. P. 7052.  The court will enter a separate order under
        FED. R. BANKR. P. 9021.

12  Copies sent to:

13  Christopher Patrick Burke, Esq.; atty@cburke.lvcoxmail.com

14  Lenard E. Schwartzer, Esq.; bkfilings@s-mlaw.com

15  Michelle Renee Schwalb
    2604 Ponderosa Pine
16  Henderson, NV 89074

17  Kathleen A. Leavitt
    302 E. Carson, #300
18  Las Vegas, NV 89101

19                                          # # #

20

21

22

23

24

25

26

33